P. REARDON, INC., Plaintiff, v. DANIEL CATON, Individu-
ally and as President of Steamship Clerks Union,
Brooklyn and Staten Island, Local No. 975,
I. L. A., an Unincorporated Association, and Others,
Defendants.

JAMES S. REARDON, as Treasurer of Truck Owners
League of the City of New York, an Unincorporated
Association, Plaintiff, v. INTERNATIONAL MERCANTILE
MARINE COMPANY et al., Defendants.

(Supreme Court, Kings Special Term, June, 1919.)

Injunctions — when injunction pendente lite will be continued — action
   to enjoin certain labor unions from enforcing a boycott — carriers
   — corporations — labor unions.

   Where plaintiff, a trucking corporation engaged in trans-
   ferring freight between railroad and steamship terminals in
   New York city, sues to enjoin certain labor unions and their
   officers from enforcing a boycott against goods carried by it,
   and it appears that plaintiff's is an open shop, that defendants
   demanded that it require all its men to join a certain union
   which a considerable number did not wish to do, and that upon
   its refusal defendants ordered the members of their unions not
   to weigh, check or handle any freight brought to the docks by
   plaintiff's trucks unless the driver wore the proper union badge,
   and it further appears that plaintiff is under contract with
   various railroads to transfer their freight for a certain part
   of the whole price of carriage from the point of origin to that
   of destination, that fifteen per cent of its drivers belong to the
   defendants' teamsters' union but have not struck, and that if
   defendants act as they threaten it will either drive plaintiff out
   of business or so disorganize its force that it will be able to
   handle only a portion of the business it is capable of and
   accustomed to handle, and the papers show that defendants' acts
   have but one purpose, namely, to unionize plaintiff's workmen
   against their will under penalty of discharge, an injunction
   *pendente lite* restraining defendants' members from refusing to
   check or weigh merchandise at the docks because it is brought

Supreme Court, June, 1919.        [Vol. 107.

in plaintiff's trucks will be continued until a trial of the merits has been had.

While concerted action by labor unions has benefited workmen in some instances in the past it does not follow that it always has results beneficial to them.

MOTION for an injunction.

Paul Bonynge, for plaintiffs.

Patrick J. McDonald, for defendant McCaffrey, individually, etc., and others.

Burlingham, Veeder, Masten & Fearey, for defendant International Mercantile Marine Company and others.

Patterson, Eagle, Greenough & Day, for France & Canada Steamship Corporation.

Haight, Sandford & Smith, for Gans Steamship Line and others.

Richard R. Rogers, for Panama Railroad Company.

Kirlin, Woolsey & Hickox, for Gaston, Williams & Wigmore Steamship Company.

Roscoe H. Hupper (special appearance), for Federal Manager Coastwise Steamship Lines of United States under Walker D. Hines, as director general, etc.

VAN SICLEN, J. The plaintiff conducts a large trucking business devoted principally to the transfer of freight between railroad and steamship terminals. A great deal of its business is done under contracts with other common carriers under which it is its duty to pick up freight brought by some other carrier to its

terminal and continue it on its journey to its ultimate destination. In the performance of this work, the plaintiff employs a considerable number of drivers and chauffeurs who may or may not, according to each individual's option, belong to any union. The defendants are officers of various unions or organizations of union men who perform various duties in connection with the freight which is brought to the steamship terminals.

The defendants have demanded of the plaintiff that it require all of its workmen to become members of a certain union or discharge them upon failure to do so. This the plaintiff has refused to do at this time, because it would disorganize its working force at a time when it is heavily obligated under existing contracts, although it has expressed a willingness to facilitate the defendants' purposes later in the year. It appears that a certain considerable proportion of plaintiff's workmen are not willing to join the union, and ultimately it may be able to replace these men with others who are now members or who are willing to become members of the union. The defendants are not willing to wait, however, and have directed the checkers, weighers, etc., on the docks to refuse to handle any freight which has been carried in plaintiff's trucks; that is to say, the members of the Checkers' Union and the Weighers' Union and the Clerks' Union and so on have been ordered not to weigh, check or handle any freight brought to the docks in any of plaintiff's trucks, unless the driver thereof wears the badge of a certain teamsters' or drivers' union. The ultimate effect of this procedure will be to force the plaintiff to require that each of its workmen join the said Teamsters' Union (something it has not the power to do) or else discharge them. If it desires to continue business, it must hire only members of the

said Drivers' Union, provided there be any such to hire.

The plaintiff claims that these acts of the defendants are unlawful in that they are directed against it and will ruin it and that discrimination is prac- ticed against it so that it cannot fulfil its exist- ing contracts. It is understood that defendants' acts have been systematically instigated and are directly calculated either to drive plaintiff out of busi- ness altogether, or disorganize its working force so that it will be able to handle only a portion of the business which it is capable of and accustomed to handling.

The defendants claim that their acts are lawful and are designed for the betterment of their members. It appears, however, that the plaintiff pays as good wages for like work as the members of the Teamsters' Union are procuring elsewhere, and that the conditions of labor under the plaintiff's employment are as good, if not better, than obtain elsewhere. It is claimed, though nothing is produced in support thereof, that in some unexplained way it will help the members of the various unions concerned, other than the Team- sters' Union, if plaintiff's employees are made to join the Teamsters' Union. Plaintiff's employees, how- ever, are satisfied with their wages and working con- ditions, and refuse to join the Teamsters' Union as demanded by the defendants. So that, unless the court can arbitrarily assume that any course which the defendants decide to pursue with reference to the plaintiff is necessarily beneficial to its members, irrespective of the established fact that it is not, the defendants have wholly failed to establish even a plausible basis for their claim. It is undoubtedly true that concerted action by the unions has benefited the workmen in other instances, but that does not estab-

lish, by any means, that all concerted action by unions has had beneficial results, for there are too many instances to the contrary.

The defendants say that their members are merely refusing to work with non-union men, *i. e.,* plaintiff's drivers, but it is plain that they are not employed and do not work with plaintiff's men. They are employees of the various steamship companies, who admit that they would accept all of the freight brought by plaintiff's trucks if the checkers, weighers, etc., would perform their work upon it, but that, if they ordered them to do so, they would all quit, and as all of such dock workers appear to be organized into some union or other, the companies say they would be worse off than the plaintiff. The defendants' members do not work with plaintiff's drivers any more than they work with the truckmen driving the trucks which bring the freight to the railroad terminal, for instance, at San Francisco, for shipment to Europe. The contract for carriage of the freight in question is made by the initial carrier for the whole distance, and each intermediate carrier gets a certain proportion of the price collected for its services. So plaintiff has contracted with various railroads to carry the freight brought by them to their terminals, thence to the various steamship piers for a certain part of the whole price of carriage. It is plain enough, therefore, that the defendants' members are not simply refusing to work with non-union men. It may be that the defendants' action will cause a betterment of the members of the Truck Drivers' Union but, if so, it can be spelled out only under the assumption that if they get the plaintiff's drivers and all other drivers in their union they can thereby create a monopoly sufficient to demand and secure higher wages than they are now getting, and can thus compel the various trucking contractors to

perform their contracts at a loss, although new contracts may provide for the higher wages and thus eventually pass the increase up to the original shipper. In the meantime, the original shipper or consignee against whom the defendants have no grievance suffers great loss as well as plaintiff.

The defendants admit that fifteen per centum of plaintiff's present force are now members of the defendant Teamsters' Union. They strenuously contend that their acts, of which plaintiff complains, are merely directed to prevent union men (checkers, weighers, scalesmen, etc.) from working with plaintiff's non-union men, yet it is a most remarkable circumstance that these union truckmen (comprising fifteen per cent of plaintiff's force) have not left plaintiff's employ or in any way attempted to refrain from working with plaintiff's other or non-union men. Thus it appears that the only union workmen who are actually working with non-union men voluntarily consent to continue to so work, and with defendants' consent.

In the last analysis, therefore, the defendants' acts have but one purpose, that is: the unionization of plaintiff's workmen against their will under penalty of discharge, and instead of persuading the individuals concerned or a substantial majority of them by showing the various alleged benefits to be derived from joining this union, they command the plaintiff to boycott its own workmen, at the peril of disorganizing its entire force, by voluntary withdrawals upon their refusal to join the organization.

The defendants' counsel has argued most ingeniously but his arguments proceed, in most instances, from wholly false assumptions in fact. For instance, his brief says: " The specific grievance of the Teamsters' Union is the refusal of the plaintiff **to permit**

the members of the union who are employed by him to wear a union button.'' There is no sworn statement of such a refusal anywhere in the papers, and, even if there was, these union men could leave plaintiff's employ either singly or in a body in protest thereof. Such action would be much more commendatory than to make the plaintiff force each unwilling workman to wear a button, thus compelling him to submit to the terms and conditions of the defendants. In other words, the defendants say it would be reprehensible for the plaintiff to forbid a union man to wear a badge, and yet they contend it would be proper for it to compel each non-union workman to wear a union badge. To such an extent is the argument reduced to an absurdity.

It is stated repeatedly that the defendants' members shall handle '' plaintiff's goods '' if it is trucked by union drivers. The merchandise in question is not plaintiff's; it never was, and never will be. It belongs to persons against whom defendants have no grievance, and who, in turn, have no control over the situation. It is contended that the defendants are merely exercising their right to refuse to handle material upon which non-union labor has been employed. The labor of one of plaintiff's non-union drivers is not employed upon this freight any more than the labor employed in making the cars, say, of the Union Pacific railroad in which these goods were carried before arriving at the terminal in New York was so employed, and yet the defendants do not contend that they are enforcing the same right against such workmen or the truck drivers who transferred this freight at Buffalo, Chicago or San Francisco. The plaintiff is the only one of all the carriers involved in each shipment who is singled out for discipline.

'' The right of one man to refuse to work for another

on any ground that he may regard as sufficient '' is a frequent quotation, and yet the refusal of any one of plaintiff's employees, union or non-union, to work for plaintiff is not in any way involved. The only union men who can rightfully be said to be working with non-union men do not seem to desire to exercise that right.

It is claimed that the acts of defendants, if successful, will broaden the field of employment for union teamsters. Plaintiff, however, is not charged with refusing to employ union teamsters. In fact, the defendants admit that fifteen per cent of plaintiff's workmen are members of other teamsters' unions. Plaintiff does not discriminate in any way between a union or non-union man. If any individual is competent and capable and the plaintiff desires his labor, it employs him irrespective of whether he belongs to the defendants' union or any other labor organization. The plaintiff's field of employment, therefore, is as open to union drivers as it possibly can be.

It is charged that the court's preliminary order is unlawful because it compels the defendants' members to work with non-union men. It does nothing of the kind. Its members, one or all, can refuse to work at any time they see fit without in any way coming within the purview of this order. The order merely restrains the defendants' members from singling some distant shipper's merchandise out of the mass presented and refusing to check or weigh it simply because it, or part of it, happened to be brought from the freight station to the dock in one of plaintiff's trucks. The fact is that defendants seek to get this court to rubber stamp their demand that non-union men be ordered to work with union men, although it is just as much a non-union man's right to refuse to work with a union man as *vice versa*.

The case at bar is clearly distinguishable from *Bossert* v. *Dhuy,* 221 N. Y. 342, and *National Protective Association* v. *Cummings,* 170 id. 315, and the principles there enunciated are not applicable to or a justification of defendants' conduct. The case of *Auburn Draying Co.* v. *Wardell,* 178 App. Div. 271, is much more pertinent to the case at bar, and the conclusions there reached are much more determinative thereof. This court is satisfied that the facts, as thus far outlined by the papers submitted, show sufficient to warrant the continuance of the injunction until a trial of the merits has been had. In the meantime, no harm can come to the defendants unless, of course, they violate the order; whereas the plaintiff will be protected to a certain extent, as it has a right to be.

Motion granted.